**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

_____
                                                  )
**UNITED STATES OF AMERICA**      )
                                                  )
    v.                                         )      **CRIMINAL NO. 3:08MJ678**
                                                  )
**JAMES R. SHERMAN,**             )
                                                )
    **Defendant**                     )
_____)

**MEMORANDUM OPINION**

This matter is before the Court on Defendant James Sherman's motion to suppress the evidence seized from Defendant pursuant to what he asserts to have been an unlawful search and seizure by investigating law enforcement (Docket No. 3). The matter has been briefed, evidence adduced, and argued. For the reasons set forth herein, the motion will be GRANTED.

**I. Factual Background**[1]

On June 24, 2008, Defendant James Sherman ("Sherman"), accompanied by his girlfriend Michelle Angell ("Angell"), drove his car onto the Fredericksburg and Spotsylvania National Military Park within this judicial district. Park Ranger Katie Sargent ("Ranger Sargent") had been monitoring the entrance to the Park in her official vehicle on the shoulder of the road when she observed Sherman's car enter the Park, and noticed that it bore an unusual license plate ("FBI-CIA") and had several antennae mounted on its exterior. As Sherman's car

---

[1] The factual summary is based on the essentially consistent testimony of all witnesses for both the prosecution and the defense as presented at the evidentiary hearing on the motion.

passed, Ranger Sargent pulled out behind him and followed him through the Park for over two miles. Ranger Sargent never observed Sherman violate any traffic laws while driving in the Park, nor did she activate her siren or emergency flashers. After traveling through the Park with Ranger Sargent following him, as Sherman observed, he turned into one of the Park's scenic overlook areas and parked his vehicle. Officer Sargent followed Sherman into the overlook area and parked her patrol car approximately twenty feet behind and perpendicular to Sherman's car.

As soon as she parked, Ranger Sargent briskly approached Sherman's vehicle. Sherman was about to get out of his car as Ranger Sargent was approaching, having one foot on the ground outside the driver's side open door. Ranger Sargent approached the drivers' side of the vehicle, and stopped approximately five feet in front and to the side of Sherman, taking up a defensive posture as she began questioning him. Ranger Sargent initiated her discussion with Sherman by asking, "What's up with your tags?" Sherman replied, "There's nothing up with them." Ranger Sargent then clarified, asking "What do they mean? Are you FBI or CIA?" and Sherman again replied, "They don't mean anything. They came with the car." Ranger Sargent also asked Sherman if he had even been questioned about the tags before, to which he responded he had not. Ranger Sargent, apparently believing that Sherman's license plates and antennae were an attempt to impersonate an officer, asked Sherman whether he had a switch for the lights, referring to any police lights on his vehicle. Sherman and/or Angell responded that the car was not equipped with any police lights.

While speaking with Sherman, Ranger Sargent believed she detected the odor of alcohol on his breath and she asked him whether he had anything to drink that afternoon. Sherman responded that he had one glass of wine at lunch. Ranger Sargent testified at the hearing on the

motion that Sherman did not display any other signs of possible intoxication – he appeared steady on his feet, he was not slurring his words, and he did not look disheveled. Nonetheless, Ranger Sargent asked Sherman and Angell, who had remained seated in the front passenger seat up until this point, to move to the front of the vehicle, where she proceeded to conduct a field breath test on Sherman. The results of the breathalyzer test indicated that Sherman had a blood-alcohol content (BAC) level of .02, well within the legal limit.

      After conducting the breathalyzer test, Ranger Sargent continued questioning Sherman, asking him whether there were any weapons in the car. Sherman responded that he possessed a concealed weapons permit. Ranger Sargent repeated her question, and Sherman then responded that he kept a revolver in the front seat next to the center console and had three more weapons in the trunk. Ranger Sargent then moved over to the car to retrieve the revolver and permit. She located the revolver, which she found loaded, and while searching for the permit, she also discovered several cigarette rolling papers. She took these items back to her patrol car, "ran" a check on the gun to see whether it had been stolen, and called for backup assistance. No adverse information was obtained concerning Sherman's ownership of the revolver. As Ranger Sargent was performing the various tasks, Sherman, still standing near the front of his vehicle, called his lawyer on his cell phone to explain the situation. Ranger Sargent noticed the activity, and approached Sherman, ordering him to get off the phone, perhaps fearing that he might be trying to call for assistance of his own. Sherman tried to explain to Ranger Sargent that he was talking to his lawyer, but Ranger Sargent continued to demand that he end the conversation, which he did.

      Shortly thereafter two more law enforcement officers arrived to provide backup

assistance to Ranger Sargent. One of the officers waited with Sherman and Angell near the front of the vehicle while Ranger Sargent conducted a search of Sherman's trunk. Her search resulted in the discovery of a pistol, two rifles, an envelope with $5,000 in cash, and two cigarettes that contained marijuana. Ranger Sargent seized the weapons and marijuana cigarettes, issued Sherman two citations for possession of an illegal substance and possession of firearms on federal property, and allowed him to depart.

Sherman argues that there was no reasonable basis for Ranger Sargent to conclude that he and/or Angell were engaged in criminal activity. He further contends that when Ranger Sargent asked him to move to the front of the vehicle and submit to a field breath test, he was seized for Fourth Amendment purposes because a reasonable person would not have felt free to leave at that juncture. The government responds that the encounter between Ranger Sargent and Sherman was consensual up until the point when Sherman admitted having weapons in his car, when probable cause to seize him ensued.

## II. Analysis

As the United States Supreme Court noted in Terry v. Ohio, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." 392 U.S. 1, 19 n.16 (1968). It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" that a "seizure" within the meaning of the Fourth Amendment has occurred. Id. Thus, an encounter with a law enforcement officer does not constitute a seizure unless the officer restrains the person's liberty through the use of force or a showing of authority to which the person yields because he does not feel free to leave. See California v. Hodari D., 499 U.S. 621, 625-26 (1991). "The test we apply in determining whether a person

has been seized for purposes of the Fourth Amendment is whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officer's requests or otherwise terminate the encounter.'" United States v. Sullivan, 138 F.3d 126, 134 (4th Cir. 1998) (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)).  See also United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  Neither side suggests that Ranger Sargent applied physical force against Sherman.  Therefore, Sherman can only demonstrate that he was seized if he either yielded to a show of Ranger Sargent's authority, or had a reasonable belief that he was not free to end the encounter and depart on his own volition.  Applying the test to the facts of this case, the Court finds there was a culmination of events that ultimately would have persuaded any reasonable mind that they were not permitted to leave before the admission by Sherman that he possessed firearms.  The question, then, is not whether a seizure did occur; rather, it is when the seizure occurred and whether probable cause existed at that point in the sequence of events to justify the seizure.

     The government contends that the interaction between Sherman and Ranger Sargent commenced as a consensual encounter.  Sherman told Ranger Sargent during their conversation that he had weapons in the vehicle, and the government argues that it was that admission that gave Ranger Sargent probable cause to believe that Sherman had committed a criminal offense.  The government necessarily argues, therefore, that no seizure occurred prior to that point since Sherman was already standing outside of his vehicle when Ranger Sargent first approached him.

Emphasizing that Ranger Sargent never activated her emergency lights, or turned on her vehicle's siren, and that she intentionally parked far enough away to avoid the appearance of blocking in Sherman to prevent his departure, the government argues that there was no sufficient demonstration of authority on the part of Ranger Sargent to which Sherman could reasonably assert he had to submit prior to his informing her that there were firearms in his car.

     The government's characterization notwithstanding, the additional circumstances that were present indicate that a reasonable person in Sherman's situation would not have felt free to leave even before his revelation concerning the presence of firearms. As soon as she parked her vehicle, Ranger Sargent hurried over to Sherman's car. While she insists that Sherman was totally outside his car but standing between his car and the open driver's door, Ranger Sargent admitted in her hearing testimony that she puposely assumed a position some five feet in front and to the side of Sherman in a defensive posture so as to still constitute confined space and movement for him. Her first words were aggressive, as she did not offer an introduction or greeting, but instead initiated the encounter in an inquisitorial way, as Ranger Sargent admitted in her testimony, by questioning Sherman as to "What's up with your tags?" Ranger Sargent then asked about "lights" on the car, referring to her suspicions that Sherman's car had police lights, and did so in a way that sounded accusatory when combined with her questions about the license plates. She then asked Sherman whether he had anything to drink that afternoon, having detected the odor of alcohol on his breath, and he responded simply to the effect of having had one glass of wine at lunch. The Ranger then administered a field breath test that did not provide inculpatory evidence. The culmination of these events ultimately would have persuaded any reasonable mind that they were not free to end the encounter. Ranger Sargent even admitted that

she would not have permitted Sherman to leave once she smelled alcohol on his breath, even though there was no other evidence of possible intoxication. It is doubtful that a reasonable person would feel free to leave an encounter with a law enforcement officer who admittedly will not let them leave. As such, the Court finds that Sherman had been seized by the time Ranger Sargent decided she was not going to allow him to leave after she smelled alcohol on his breath and administered the field breath test with negative (or insufficient) results where, the ensuing search could only have been permissible if probable cause to proceed had existed at that juncture. The Supreme Court defines probable cause as "a fair probability that contraband or evidence of a crime will be fond in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether probable cause exists requires a twofold determination. Ornelas v. United States, 517 U.S. 690, 696 (1996). First, the Court must determine the "historical facts," meaning the events that occurred leading up to the stop or search. Id. Second, the Court must decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to probable cause. Id. Ranger Sargent acknowledged that she never observed Sherman violate any traffic laws while driving in the Park, such as excessive speed or weaving. In addition, Sherman's behavior while talking with Ranger Sargent did not suggest any criminal activity. Finally, his BAC-level was well below the legal limit for public intoxication. Thus, the Court concludes that Ranger Sargent did not have probable cause to probe further into Sherman's activities after finding Sherman's BAC-level to be within the legal limits, and that the "seizure" had otherwise occurred at that point, at the latest.

Therefore, the firearms and marijuana discovered thereafter in the interior and truck of Defendant's vehicle constitute the fruits of an illegal search and Defendant's motion to suppress

must therefore be GRANTED.

       An appropriate Order shall issue.

                                                                                     _____/s/_____
                                                Dennis W. Dohnal
                                                United States Magistrate Judge

Richmond, Virginia
Date: March 3, 2009