IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 3:08MJ678–HEH |
| ) | |
| JAMES R. SHERMAN, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This an appeal from an Order of the United States magistrate judge granting the Defendant's motion to suppress certain evidence seized by a United States park ranger at the Fredericksburg and Spotsylvania National Military Park. Both parties have been afforded an opportunity to file memoranda of law supporting their respective positions and have waived oral argument. In accordance with Rule 58 of the Federal Rules of Criminal Procedure, the scope of this appeal is the same as an appeal to the Court of Appeals from a judgment entered by a district court. Accordingly, this Court must adopt the factual findings of the magistrate judge unless they are clearly erroneous. The lower court's conclusions of law are reviewed *de novo*. *United States v. Jones*, 356 F.3d 529, 533 (4th Cir. 2004).

The Court's analysis begins with the impression that the initial encounter in this case between the defendant and the park ranger was consensual and that their interactions evolved into probable cause to search the defendant's vehicle. However, the legal

significance of the events that intervened are the central issue and must be evaluated incrementally.

The evidence presented before the United States magistrate judge revealed that on June 24, 2008, U.S. Park Ranger Katie Sargent ("Ranger Sargent") observed the defendant's vehicle enter the Fredericksburg and Spotsylvania National Military Park ("the Park"), which is situated within the jurisdiction of this Court. The defendant, James Sherman ("Sherman"), was operating the vehicle, and his girlfriend, Michelle Angell, occupied the passenger seat. Ranger Sargent was positioned at the entrance of the Park in a marked U.S. Park Service vehicle. Ranger Sargent's attention was drawn to the defendant's vehicle by its unusual license plate, "FBI-CIA," and the several antennae mounted on the vehicle's exterior.

As the defendant's vehicle passed in front of her, Ranger Sargent pulled out and followed for over two miles. It is undisputed that Ranger Sargent observed no traffic violations by the defendant and at no time activated her siren or emergency lights. The defendant eventually pulled into Prospect Hill,[1] a scenic overlook area, and parked his vehicle. Ranger Sargent followed, parking her patrol car approximately 20 feet behind and perpendicular to the defendant's car.

Ranger Sargent alighted from her vehicle and briskly approached Sherman as he was about to get out of his car. The defendant, at that time, had one foot on the ground

---

[1] The ranger described Prospect Hill as a high crime area where drug transactions take place. (Tr. 47.)

2

outside the open driver's side door. Ranger Sargent walked along the driver's side of the vehicle and assumed a defensive posture approximately five feet in front and to the side of the defendant.

Ranger Sargent initiated contact by asking, "What's up with your tags?" Sherman replied, "There's nothing up with them." Ranger Sargent followed up by inquiring, "What do they mean? Are you FBI or CIA?" The defendant responded, "They don't mean anything. They came with the car." The defendant then stated, in response to Ranger Sargent's next question, that he had never been previously questioned about the tags. Finally, Ranger Sargent asked the defendant whether the vehicle was equipped with a switch to activate any type of emergency lights. The magistrate judge concluded that Ranger Sargent apparently believed that the defendant's license plates and antennae may have been an attempt to impersonate a law enforcement officer. Either the defendant or his girlfriend responded that the car was not equipped with any such police equipment.

During her conversation with the defendant, Ranger Sargent detected what she believed to be the odor of alcohol on his breath and asked whether he had been drinking that afternoon. The defendant responded that he had one glass of wine at lunch. Ranger Sargent observed that his eyes appeared bloodshot, but noticed no other signs suggestive of intoxication. He seemed steady on his feet and was neither slurring his words nor looked disheveled. At this point, Ranger Sargent asked the defendant and the passenger to walk over to a tree in front of the vehicle. After receiving his consent, Ranger Sargent proceeded to conduct a field sobriety test on the defendant using a portable breathalyzer

testing device. The results indicated that the defendant had a blood alcohol content level of .02, well within the permissible legal limit.[2]

The magistrate judge found that after administering the field breathalyzer test, Ranger Sargent asked the defendant whether there were any weapons in the car.[3] Initially, he responded evasively by merely indicating that he possessed a concealed weapons permit. When Ranger Sargent repeated her question, the defendant, who found the conversation humorous (Tr. 53), disclosed that he kept a revolver in the front seat, next to the center console, and three additional weapons in the trunk of the car. At that point, Ranger Sargent proceeded to the vehicle, located the revolver, which she found to be loaded, and attempted to locate the concealed weapons permit. During the course of her foray, she discovered several cigarette rolling papers.

After seizing the weapon in the interior area, Ranger Sargent ran a computerized check to determine if the gun had been stolen, and received a negative response. As she was requesting assistance from other officers, Ranger Sargent observed the defendant conversing on his cell phone. The defendant tried to explain that he was talking to his

---

[2]Ranger Sargent testified during the evidentiary hearing on the motion to suppress that prior to administering the portable breathalyzer, she asked the defendant if he had any weapons in the vehicle. She testified that asking that question was her standard practice. She further stated that the defendant replied that he had a concealed weapons permit and that there was a gun in the console next to the passenger's seat. According to Ranger Sargent, she next walked over to the vehicle and was able to observe a black holster containing a revolver located in the console in the passenger's seat. (Tr. 53–55.) Apparently, the magistrate judge chose not to credit this portion of Ranger Sargent's testimony.

[3]Possessing, using, or carrying a weapon in national parks is prohibited. 36 C.F.R. § 2.4.

4

lawyer, but Ranger Sargent demanded that he end the conversation.[4] The defendant complied.

After other officers arrived, Ranger Sargent conducted a search of the trunk of the defendant's vehicle. The search yielded a pistol, two rifles, an envelope with $5,000 in cash, and two cigarettes that contained suspected marijuana. After seizing the weapons and marijuana cigarettes, Ranger Sargent issued the defendant two summons for possession of a controlled substance and for possession of firearms on federal property. The defendant and his passenger were then allowed to leave the Park in his vehicle.

As the magistrate judge noted in his Memorandum Opinion, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The Fourth Amendment is not implicated when a law enforcement officer approaches someone in a public place and asks a person to answer a few questions. *Florida v. Bostick*, 501 U.S. 429, 439–40 (1991); *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002), *cert. denied*, 123 S. Ct. 186 (2002). The magistrate judge also correctly noted that a consensual encounter can evolve into a seizure within the meaning of the Fourteenth Amendment when the individual's liberty has been restrained by means of physical force or show of authority by the officer. *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991). The boundary between these levels of contact is

---

[4]The ranger explained her rationale for directing Sherman to cease his telephone call. "Just for officer safety concerns. I didn't want anybody on the phone calling their friends nearby to come out, and additional person, weapons, any additional trouble." (Tr. 57.)

unfortunately not well defined. As the Supreme Court noted in *United States v. Sharpe*, "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. 675, 685 (1975). The same logic applies in the transition from consensual encounter to investigative detention.

Drawing from settled U.S. Supreme Court precedent, the United States Court of Appeals for the Fourth Circuit has provided guidance to trial courts in determining that point of transition. "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." *Weaver*, 282 F.3d at 309–10; *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A suspect's subjective impression as to his or her perceived freedom of movement, however, is not determinative. *United States v. Elston*, 479 F.3d 314, 319–20 (4th Cir. 2007), *cert. denied*, 127 S. Ct. 2151 (2007).

There is no evidence in this case that the defendant's decision to park his vehicle at the overlook was in any way compelled by the actions of Ranger Sargent. The ranger parked her vehicle in the bus parking lot behind the defendant's car. She denied that her vehicle was blocking or obstructing the defendant's automobile. (Tr. 51.) Nether the defendant or his passenger dispute this contention. (Tr. 88–89.) In fact, the defendant testified that the ranger's vehicle was approximately 20 feet from his car. (Tr. 88.) The defendant was just stepping out of his vehicle when the ranger approached. A series of

questions ensued concerning his license plates. In this Court's view, no reasonable person would have believed that he or she was not free to leave. At this point, the interaction between the ranger and the defendant was consensual, despite the aggressive nature of her questioning. As Justice White emphasized in his concurring opinion in *Terry*, "[t]here is nothing in the Constitution which prevents a policemen from addressing questions to anyone on the streets." *Terry*, 392 U.S. at 34.

During the course of the ranger's conversation with the defendant, she detected the odor of alcohol on his breath and noticed that his eyes appeared to be bloodshot. (Tr. 81.) At that juncture, Ranger Sargent testified that the defendant was not free to leave. Notwithstanding the absence of any other physical symptoms of intoxication, the smell of alcohol, coupled with bloodshot eyes, was sufficient to justify a brief detention of the defendant to determine whether he was operating his vehicle under the influence of alcohol. Within minutes, and with the consent of the defendant, the ranger administered a preliminary breath test to determine if he was intoxicated. The results revealed that his blood alcohol level was considerably below the legal threshold of intoxication. There is no evidence that the length of time required to administer the preliminary breath test exceeded a reasonable amount of time necessary to complete her investigation of the defendant's alcohol consumption. The defendant's freedom of action, at that point, had not been curtailed to a degree associated with formal arrest. *Elston*, 479 F.3d at 319. *See also United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Viewing the evidence in the light most favorable to the defendant, who prevailed below, immediately after the preliminary breath test, Ranger Sargent asked the defendant if he had any guns in the car. The defendant initially responded that he had a concealed weapons permit. Apparently finding the answer unresponsive, Ranger Sargent repeated her question. The defendant replied that he kept a revolver in the front seat, next to the center console, and had three more weapons in the trunk.

In his memorandum opinion, the magistrate judge concluded that "Ranger Sargent did not have probable cause to probe further into [the defendant's] activities after finding [the defendant's] BAC-level to be within the legal limits, and that the 'seizure' had otherwise occurred at that point, at the latest." The magistrate judge found that the firearms and marijuana discovered in the interior and trunk of the defendant's vehicle constituted fruits of an illegal search and granted the defendant's motion to suppress. On careful review, this Court disagrees with the magistrate judge's conclusion.

Although the record reveals no precise time line, according to the defendant and his passenger, the questions concerning weapons followed immediately on the heels of the breath test results, most likely within seconds. Ranger Sargent testified that she routinely asked persons she confronts in the Park whether they were armed. In *United States v. Alpert*, the Fourth Circuit noted that "[a]mong the circumstances which must be considered [when determining the reasonableness of a stop] are the duration of time the suspect is delayed by the stop . . . [and] whether the police acted diligently." *Alpert*, 816

F.2d 958, 964 (4th Cir. 1987); *see also Young v. Prince George's County*, 355 F.3d 751, 756 (4th Cir. 2004); *Sharpe*, 470 U.S. at 686.

The additional questions posed by Ranger Sargent caused minimal inconvenience to the defendant who was parked in an area known for criminal activity. Although the ranger's questions were direct and probing in nature, the defendant apparently found them humorous, rather than intimidating. The delay occasioned by this final series of questions was not unreasonable under any standard of legal measure. Once the defendant disclosed that he was in possession of firearms in a national park, the ranger had probable cause to believe that his vehicle contained evidence of the commission of a crime, *see* 36 C.F.R. § 2.4, and all that ensued was lawful. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

For the foregoing reasons, this Court will reverse the magistrate judge's decision to grant the defendant's motion to suppress and remand this case for further proceedings consistent with this opinion.

An appropriate Order will accompanying this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: May 15, 2009
Richmond, VA

9